## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

**DEACERO, S.A.P.I. DE C.V. AND DEACERO USA, INC.**

    **Plaintiffs,**

**v.**

**UNITED STATES,**

    **Defendant,**

**and**

**REBAR TRADE ACTION COALITION,**

    **Defendant-Intervenor.**

Court No. 20-03924

## BRIEF IN SUPPORT OF PLAINTIFFS'
## <u>MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>

Rosa S. Jeong
Friederike S. Görgens
Sonali Dohale
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC  20037
(202) 331-3100 (Phone)
(202) 331-3101 (Fax)

*Counsel for Plaintiffs Deacero, S.A.P.I. de C.V. and Deacero USA, Inc.*

May 10, 2021

# TABLE OF CONTENTS

ADMINISTRATIVE DETERMINATION TO BE REVIEWED ................................. 1

ISSUES PRESENTED FOR REVIEW ..................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

I.     SECTION 232 AND THE IMPOSITION OF 232 DUTIES ON STEEL IMPORTS
FROM MEXICO .............................................................................................. 2

II.    AGREEMENT TO ELIMINATE SECTION 232 DUTIES ON MEXICAN IMPORTS
OF STEEL PRODUCTS................................................................................... 5

III.   IMPACT OF 232 DUTIES ON DEACERO IN THE 2017-2018 REVIEW..................... 6

SUMMARY OF ARGUMENT ................................................................................. 8

ARGUMENT ............................................................................................................ 9

I.     STANDARD OF REVIEW ............................................................................. 9

II.    COMMERCE'S USE OF UNTIMELY AND THEREFORE UNLAWFUL SECTION
232 DUTIES TO CALCULATE ANTIDUMPING MARGINS WITH RESPECT TO
DEACERO IS NOT IN ACCORDANCE WITH LAW.................................................. 10

     A.     The President Failed to Implement Action Under Section 232 Within the
Applicable Time Limits ...................................................................... 11

     B.     No Exception to the Time Limit Applies............................................. 13

     C.     Because Section 232 Duties on Mexican Imports Were Unlawful, the Deduction
of Such Duties Was Ultra Vires........................................................... 21

III.   SECTION 232 DUTIES ARE NOT ORDINARY CUSTOMS DUTIES ........................ 21

     A.     Section 232 Duties are Remedial ........................................................ 24

     B.     Section 232 Duties are Temporary ..................................................... 27

     C.     Deduction of Section 232 Duties from the U.S. Price of Mexican Steel Imports
Results in an Impermissible Double Remedy ..................................... 28

IV.   COMMERCE'S DECISION TO DEDUCT SECTION 232 DUTIES FROM U.S. PRICE
WITHOUT NOTICE VIOLATES LONGSTANDING PRINCIPLES OF
ADMINISTRATIVE LAW ............................................................................ 31

     A.     Commerce Failed to Submit its Rule Regarding Deduction of Section 232 Duties
for Notice and Comment....................................................................... 32

B.      Commerce's Determination to Deduct Section 232 Duties is Impermissibly Retroactive and Upset Deacero's Reliance Interests ........................................... 34

CONCLUSION ......................................................................................................................... 36

**Page(s)**

**Federal Cases**

*A.H. Phillips, Inc. v. Walling,*
    324 U.S. 490 (1945)...............................................................................................16

*AK Steel Corp. v. United States,*
    21 CIT 1265, 988 F. Supp. 594 (1997) ................................................................21

*ALZ N.V. v. United States,*
    27 C.I.T. 1265, 283 F. Supp. 2d 1302 (2003) ...............................................34, 35

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. United States,*
    494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ......................................23, 27, 28, 29

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988)...............................................................................................34

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)...............................................................................................16

*Chevron U.S.A., Inc. v. Natural Resources Defense Council Inc.,*
    467 U.S. 837 (1984)...........................................................................10, 22, 33, 34

*In re City of Houston,*
    731 F.3d 1326 (Fed. Cir. 2013)..............................................................................31

*Comm'r v. Clark,*
    489 U.S. 726 (1989)...............................................................................................16

*Consolidated Edison Co. v. NLRB,*
    305 U.S. 197 (1938).................................................................................................9

*Davis v. Mich. Dept. of Treasury,*
    489 U.S. 803 (1989)...............................................................................................16

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016)...........................................................................................36

*Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548 (1976) ...........................12

*Fieldston Clothes, Inc. v. United States,*
    19 CIT 1181, 903 F. Supp. 72  (1995) ..................................................................21

*In re Gartside,*
    203 F.3d 1305 (Fed. Cir. 2000)..............................................................................29

*Hoogovens Staal BV v. United States*,
 22 CIT 139, 4 F. Supp. 2d 1213 (1998) ...............................................................21

*Kearfott Guidance & Navigation Corp. v. Rumsfeld*,
 320 F.3d 1369 (Fed. Cir. 2003) ...........................................................................35

*Landgraf v. USI Film Prods.*,
 511 U.S. 244 (1994) .............................................................................................35

*United States v. Mead Corp.*,
 533 U.S. 218 (2001) .......................................................................................10, 22

*Melex USA, Inv. v United States*,
 19 CIT 1130, 899 F. Supp. 632 (1995) ..................................................................9

*Murray v. Schooner Charming Betsy*,
 6 U.S. 64 (1804) ...................................................................................................31

*National Association of Manufacturers v. United States Department of Homeland
 Security*,
 491 F. Supp. 3d 549 (N.D. Ca. 2020) ..................................................................21

*NTN Bearing Corp. of America v. United States*,
 24 CIT 385, 104 F. Supp. 2d 110 (2000) .............................................................10

*Paralyzed Veterans of Am. v. West*,
 138 F.3d 1434 (Fed. Cir. 1998) ...........................................................................33

*Power Integrations, Inc. v. Lee*,
 797 F.3d 1318 (Fed. Cir. 2015) ...........................................................................29

*Preminger v. Sec'y of Veterans Affs.*,
 632 F.3d 1345 (Fed. Cir. 2011) ...........................................................................33

*PrimeSource Bldg. Prods. v. United States*,
 No. 20-00032, 2021 Ct. Intl. Trade LEXIS 10 (2021) ...................................13, 14

*Sanyo Electric Co., Ltd. v. United States*,
 23 CIT 355, 86 F. Supp. 2d 1232 (1999) .............................................................10

*Steel Auth. of India, Ltd. v. United States*,
 25 CIT 482, 149 F. Supp. 2d 921 (2001) .............................................................10

*Thai Pineapple Canning Indus. Corp. v. United States*,
 273 F.3d 1077 (Fed. Cir. 2001) ...........................................................................10

*Transpacific Steel LLC v. United States*,
 415 F. Supp. 3d 1267 (Ct. Int'l Trade 2019) ..................................................13, 14

*Transpacific Steel LLC v. United States,*
    466 F. Supp. 3d 1246 *(Ct. Int'l Trade 2020)* ................................................. *passim*

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ..................................................................................9

*Universal Steel Products v. United States* No. 19-00209, 2021 Ct. Int'l Trade
    LEXIS 12 (2021) .................................................................15, 16, 17, 18, 19

*W. Air Lines, Inc. v. Bd. of Equalization of State of S.D.,*
    480 U.S. 123 (1987) ................................................................................15

*Wheatland Tube Co. v. United States,*
    495 F.3d 1355 (Fed. Cir. 2007) .................................................... *passim*

*Williams v. Taylor,*
    529 U.S. 362 (2000) ..........................................................................17, 19

**Federal Statutes**

5 U.S.C. § 551(4) .........................................................................................32

5 U.S.C. § 553(b)-(d) ...................................................................................32

5 U.S.C. § 553(b)(3)(A) ...............................................................................33

19 U.S.C. § 1516a(b)(1)(B) ...........................................................................9

19 U.S.C. § 1677a(c)(2)(A) .................................................................. *passim*

19 U.S.C. § 1862(b) (1982) ..........................................................................20

19 U.S.C. § 1862(b)(1)(A) .............................................................................2

19 U.S.C. § 1862(b)(3)(A) .........................................................................2, 11

19 U.S.C. § 1862(c)(1) ......................................................................... *passim*

19 U.S.C. § 1862(c)(1)(A) .................................................................2, 11, 14, 15

19 U.S.C. § 1862(c)(1)(A)(ii) ............................................................11, 16, 17

19 U.S.C. § 1862(c)(1)(B) .................................................................... *passim*

19 U.S.C. § 1862(c)(2) ...................................................................................3

19 U.S.C. § 1862(c)(3) ......................................................................... *passim*

19 U.S.C. § 1862(c)(3)(A) ...............................................................14, 15, 16, 20

19 U.S.C. § 1862(c)(3)(A)(i) ...........................................................................................13

19 U.S.C. § 1862(c)(3)(A)(ii) ..........................................................................................15

19 U.S.C. § 3511 ..............................................................................................................28

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100–418, Title I, §
    1501, 102 Stat. 1107, 1257–60 (1988) .....................................................................2

Trade Expansion Act of 1962, Pub. L. No. 87-794, Title II, § 232, 76 Stat. 872,
    877 (1962) (codified as amended 19 U.S.C. § 1862) ...............................................2

**Administrative Determinations**

*Circular Welded Carbon Steel Standard Pipe and Tube Products From Turkey:*
    *Final Results of Antidumping Duty Administrative Review and Final*
    *Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 3616 (Dep't of
    Commerce Jan. 22, 2020) ........................................................................................32

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico:*
    *Final Results of Antidumping Duty Administrative Review and Final*
    *Determination of No Shipments; 2017-2018,* 85 Fed. Reg. 41962 (Dep't of
    Commerce Jul. 13, 2020) .........................................................................................32

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84
    Fed. Reg. 2,159, 2,161 (Dep't of Commerce Feb. 6, 2019) ......................................6

*Light-Walled Rectangular Pipe and Tube From Mexico: Final Results of*
    *Antidumping Duty Administrative Review and Final Determination of No*
    *Shipments; 2017-2018,* 85 Fed. Reg. 21829 (Dep't of Commerce Apr. 20,
    2020) .........................................................................................................................32

*Notice of Antidumping Proceedings: Treatment of Section 201 Duties and*
    *Countervailing Duties,* 68 Fed. Reg. 53,104 (Dep't of Commerce Sep. 2003)......................33

*Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United*
    *States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018) .................................................. passim

*Proclamation 9711 of March 22, 2018 Adjusting Imports of Steel Into the United*
    *States*, 83 Fed. Reg. 13,361 (Mar. 28, 2018) .................................................. passim

*Proclamation 9740 of April 30, 2018 Adjusting Imports of Steel Into the United*
    *States*, 83 Fed. Reg. 20,683, 20,685 (May 7, 2018)......................................... passim

*Proclamation 9772 of August 10, 2018 Adjusting Imports of Steel Into the United*
    *States*, 83 Fed. Reg. 40,429 (Aug. 15, 2018). ......................................13, 14, 16, 19

*Proclamation 9894 of May 23, 2019 Adjusting Imports of Steel Into the United*
    *States*, 84 Fed. Reg. 23,987 (May 23, 2019).................................................... passim

*Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40,202 (Dep't of Commerce July 6, 2020) .................. *passim*

*Steel Concrete Reinforcing Bar from Mexico: Antidumping Duty Order*, 79 Fed. Reg. 65,925 (Dep't of Commerce Nov. 6, 2014) ...................................................................... 6

*Steel Concrete Reinforcing Bar from Mexico: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 71,053 (Dep't of Commerce Nov. 6, 2020) ................................................................................................................ 1

*Steel Concrete Reinforcing Bar From Mexico: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 2,702 (Dep't of Commerce Jan. 16, 2020) ........................................................................... 6

## Other Authorities

*Joint Statement by the United States and Mexico on Section 232 Duties on Steel and Aluminum*, U.S. TRADE REP., *available at* https://ustr.gov/sites/default/files/Joint_Statement_by_the_United_States_and_Mexico.pdf ............................................................................................................ 5

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, U.S. Ct. Int'l Trade R. 56.2, Plaintiffs Deacero S.A.P.I. de C.V. and Deacero USA, Inc. (together, "Deacero") respectfully submit this brief in support of their Rule 56.2 Motion for Judgment Upon the Agency Record.

## ADMINISTRATIVE DETERMINATION TO BE REVIEWED

The administrative determination to be reviewed in these proceedings is *Steel Concrete Reinforcing Bar from Mexico: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 71,053 (Dep't of Commerce Nov. 6, 2020) ("Final Results") (P.R. 211). The Department of Commerce's ("Commerce") factual and legal conclusions underlying the Contested Final Determination are set forth in the accompanying "Steel Concrete Reinforcing Bar from Mexico: Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review; 2017-2018" dated November 2, 2020 ("Final IDM") (P.R. 192).

## ISSUES PRESENTED FOR REVIEW

1.      Can Commerce treat Section 232 duties as "ordinary" customs duties and deduct these duties from U.S. price in calculating antidumping duty margins when the duties themselves as applied to imports of Mexican steel products are unlawful because they were implemented outside of the applicable statutory time limits?

2.      Can Commerce treat Section 232 duties as "ordinary" customs duties and deduct these duties from U.S. price in calculating antidumping duty margins by deducting these duties from U.S. price for Mexican importers when the duties are remedial in nature, temporary, and subject to a Joint Bilateral Agreement that links Section 232 duties to dumped and subsidized goods?

3.      Can Commerce deduct Section 232 duties from U.S. price in calculating antidumping duty margins in administrative review proceedings when it never submitted its

interpretation of "United States import duties" with respect to Section 232 for public notice and comment?

## STATEMENT OF FACTS

**I.** **SECTION 232 AND THE IMPOSITION OF 232 DUTIES ON STEEL IMPORTS FROM MEXICO**

Congress enacted Section 232 of the Trade Expansion Act of 1962, which authorized the President to adjust imports that pose a threat to the national security of the United States. *See* Trade Expansion Act of 1962, Pub. L. No. 87-794, Title II, § 232, 76 Stat. 872, 877 (1962) (codified as amended 19 U.S.C. § 1862) ("Section 232"). Since its original passage, there have been several amendments of the statute. The most recent substantive change to Section 232 occurred in 1988, when the statute was altered to add time limits on the President's ability to act pursuant to the Secretary of Commerce's ("Secretary") affirmative finding that investigated imports are a threat to national security. *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100–418, Title I, § 1501, 102 Stat. 1107, 1257–60 (1988).

The current process to adjust imports under Section 232 involves multiple steps and time limits. First, the Secretary, in consultation with the Secretary of Defense, initiates an investigation "to determine the effects on the national security of imports of the article[s]." 19 U.S.C. § 1862(b)(1)(A). No later than "270 days after the date on which an investigation is initiated . . . , the Secretary shall submit to the President a report on the findings" that will advise the President if articles being imported into the United States threaten to impair national security and recommend appropriate action. *Id*. § 1862(b)(3)(A) (citation omitted). Second, after receiving the Secretary's report, the President "[w]ithin 90 days," must determine whether he or she concurs with the Secretary and, if so, "determine the nature and duration of the action" to "adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." *Id*. § 1862(c)(1)(A). The President "shall implement that action" no

later than 15 days from his or her decision to take such action. *Id*. § 1862(c)(1)(B). Finally, within 30 days after making any determination, the President must submit to Congress a written statement of reasons for taking that action. *Id*. § 1862(c)(2).

On April 19, 2017, Commerce initiated a Section 232 investigation to determine the effects of steel imports on national security. *See Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40,202, 40,208 (Dep't of Commerce July 6, 2020) ("Steel Report"). On January 11, 2018, the Secretary of Commerce issued his report and recommendation to the President. *Id*. at 40,202. The Secretary found that the availability of steel manufactured by a healthy domestic industry is important to national defense, that steel "[i]mports in such quantities as are presently found adversely impact the economic welfare of the U.S. steel industry," that the "displacement of domestic steel by excessive quantities of imports has the serious effect of weakening our internal economy," and that "global excess steel capacity is . . . weakening the domestic economy." *Id*. at 40,210, 40,218, 40,223 (citation omitted). In light of these findings, the Secretary recommended that the President act to adjust the level of imports through quotas or tariffs on steel imported into the United States. *Id*. at 40,225.

Subsequently, on March 8, 2018, then-President Donald Trump issued Proclamation 9705, which imposed a 25 percent *ad valorem* tariff on imports of steel products effective March 23, 2018. *See Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018) ("Proclamation 9705"). Notably, the duties imposed by Proclamation 9705 applied to steel imports from all countries except those from Canada and Mexico. *See id.* para. 8, at 11,626. With respect to Canada and Mexico, Proclamation 9705 stated:

> Canada and Mexico present a special case. Given our shared
> commitment to supporting each other in addressing national

security concerns, our shared commitment to addressing global excess capacity for producing steel, the physical proximity of our respective industrial bases, the robust economic integration between our countries, the export of steel articles produced in the United States to Canada and Mexico, and the close relation of the economic welfare of the United States to our national security, see 19 U.S.C. 1862(d), I have determined that the necessary and appropriate means to address the threat to the national security posed by imports of steel articles from Canada and Mexico is to continue ongoing discussions with these countries and to exempt steel articles imports from these countries from the tariff, at least at this time. I expect that Canada and Mexico will take action to prevent transshipment of steel articles through Canada and Mexico to the United States.

*Id.* para. 10.

On March 22, 2018, President Trump issued Proclamation 9711, in which he again addressed Section 232 tariffs on imports from Mexico and Canada. *See Proclamation 9711 of March 22, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 13,361 (Mar. 28, 2018) ("Proclamation 9711"). Proclamation 9711 declared that "the United States is continuing discussion with Canada and Mexico . . . on satisfactory alternative means to address the threatened impairment to the national security by imports of steel articles . . . and I have determined that the necessary and appropriate means to address the threat to the national security posed by imports from steel articles from these countries is to continue these discussions and to exempt steel articles imports from these countries from the tariff, at least at this time." *Id.* para. 4, at 13,361. However, Proclamation 9711 then announced that a 25 percent tariff on steel imports from Canada and Mexico will be imposed as of 12:01 am on May 1, 2018, "unless [the President] determine[s] by further proclamation that the United States has reached a satisfactory alternative means to remove the threatened impairment to the national security by imports of steel articles [from Canada and Mexico]." *Id.* para. 11, at 13,362, cl. (1), at 13,363. On April 30, 2018 the President extended the effective date for tariffs to be implemented on steel imports from Canada and Mexico until 12:01 am on June 1, 2018. *See Proclamation 9740 of April 30,*

*2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20,683, 20,685 (May 7, 2018) ("Proclamation 9740"). The deadline of June 1, 2018 passed without any further proclamations; subsequently, tariffs on steel imports from Canada and Mexico took effect on June 1, 2018. *See id.*

## II.    AGREEMENT TO ELIMINATE SECTION 232 DUTIES ON MEXICAN IMPORTS OF STEEL PRODUCTS

The tariffs on Mexican steel products remained in place until May 2019, when the United States and Mexico reached an agreement to remove Section 232 duties on imports of steel products from Mexico (the "Joint Agreement"). *See Joint Statement by the United States and Mexico on Section 232 Duties on Steel and Aluminum*, U.S. TRADE REP., *available at* https://ustr.gov/sites/default/files/Joint_Statement_by_the_United_States_and_Mexico.pdf; *see also Proclamation 9894 of May 23, 2019 Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23,987 (May 23, 2019) ("Proclamation 9894"). Under the Joint Agreement, the United States agreed to eliminate by May 21, 2019, "[a]ll tariffs the United States imposed under Section 232 on imports of aluminum and steel products from Mexico." Joint Agreement at 1. In turn, Mexico agreed to eliminate "[a]ll tariffs Mexico imposed in retaliation for the Section 232 action taken by the United States." *Id.* In explaining his decision to remove the tariffs against Mexico and Canada, President Trump explained:

> The United States has successfully concluded discussions with Canada and Mexico on satisfactory alternative means to address the threatened impairment of the national security posed by steel articles imports from Canada and Mexico. The United States has agreed on a range of measures with Canada and Mexico to prevent the importation of steel articles that are unfairly subsidized or sold at dumped prices, to prevent the transshipment of steel articles, and to monitor for and avoid import surges. These measures are expected to allow imports of steel articles from Canada and Mexico to remain stable at historical levels without meaningful increases, thus permitting the domestic industry's capacity utilization to continue at approximately the target level recommended in the Secretary's report. In my judgment, these

measures will provide effective, long-term alternative means to address the contribution of these countries' imports to the threatened impairment of the national security.

Proclamation 9894 para. 5.

## III.    IMPACT OF 232 DUTIES ON DEACERO IN THE 2017-2018 REVIEW

In November 2014, Commerce published its Antidumping Duty Order on steel concrete reinforcing bar ("rebar") from Mexico. *See Steel Concrete Reinforcing Bar from Mexico: Antidumping Duty Order*, 79 Fed. Reg. 65,925 (Dep't of Commerce Nov. 6, 2014). In response to timely filed requests for review, Commerce initiated an antidumping duty administrative review of steel concrete reinforcing bar from Mexico for the period November 1, 2017, through October 31, 2018. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 2,159, 2,161 (Dep't of Commerce Feb. 6, 2019) (P.R. 8). Deacero participated as a mandatory respondent and timely responded to all requests for information by Commerce.

On January 16, 2020, Commerce published in the *Federal Register* its preliminary results, in which Commerce determined a preliminary antidumping duty margin of 7.25 percent for Deacero. *See Steel Concrete Reinforcing Bar From Mexico: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 2,702 (Dep't of Commerce Jan. 16, 2020) ("Preliminary Results") (P.R. 143). Commerce's factual and legal conclusions underlying the Preliminary Results are set forth in the accompanying "Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review: Steel Concrete Reinforcing Bar from Mexico; 2017-2018" dated January 9, 2020 ("Preliminary IDM") (P.R. 133).

In the Preliminary Results, Commerce examined the issue of whether Section 232 duties imposed on subject rebar imported during the period of review should be deducted from the U.S.

sales price. *See* Preliminary IDM at 12-14 (P.R. 133). Commerce described the multi-factor analytical framework it utilized when determining not to deduct Section 201 duties from U.S. price calculations, which was upheld by the U.S. Court of Appeals for the Federal Circuit ("CAFC") in *Wheatland Tube Co. v. United States,* 495 F.3d 1355, 1358 (Fed. Cir. 2007). *See id.* Commerce preliminarily concluded that "Section 232 duties are not akin to antidumping or 201 duties" because of the national security focus of Section 232 duties. *Id.* at 13. Commerce also explained that Proclamation 9705 states that Section 232 duties "are to be imposed in addition to other duties unless expressly provided for in the proclamations." *Id.* While Commerce recognized that with respect to Mexico, Proclamation 9894 excluded Mexico and Canada from the Section 232 duties, it "preliminarily determine[d] that, because the proclamation took effect after the end of the POR of the instant review and contains no retroactive clause, it is appropriate to continue to deduct the 232 duties paid on Deacero's entries of subject merchandise during the POR from the U.S. price." *Id.* at 14.

On June 17, 2020, Deacero timely submitted its case brief, in which it objected to the deduction of Section 232 duties. *See* Letter on Behalf of Deacero S.A.P.I. de C.V. and Deacero USA, Inc., re: Steel Reinforcing Bar from Mexico: Case Brief (June 17, 2020) (Public Document) (P.R. 173). Deacero argued Section 232 duties could not be considered "United States import duties" for many of the same reasons that Commerce found Section 201 duties were not "United States import duties" and discussed in *Wheatland. See id.* at 5-15. Deacero noted that Section 232 duties *are* remedial in nature and temporary, unlike "ordinary" import duties, and like Section 201 and antidumping duties. *See id.* at 8-12. Further, Deacero highlighted the unique history and nature of Section 232 duties on imports from Mexico and the need to avoid double-counting those duties in light of Proclamation 9894 and the Joint Agreement. *See id.* at 13-15. Deacero also requested that Commerce establish its interpretation of

"United States import duties" with respect to Section 232 duties through formal notice-and-comment rulemaking, in compliance with the Administrative Procedure Act and as it had done before making a determination with respect to Section 201 duties. *See id.* at 17-19.

In the *Final Results*, Commerce disagreed with Deacero's arguments and continued to deduct the amount of Section 232 duties paid by Deacero from Deacero's prices of U.S. sales. *See* Final IDM at 11-13 (P.R. 192). Commerce continued to focus on the fact that Section 232 duties are different than Section 201, antidumping, and countervailing duties and found "that section 232 duties are not focused on remedying injury to a domestic injury [sic]." *Id.* at 12. With respect to Deacero's concerns regarding double counting of section 232 duties, Commerce relied on the language in Proclamation 9705 (without considering Proclamation 9894's clear reference to antidumping duties and the remedial nature of the Section 232 duties on imports from Mexico) and noted:

> No express reduction to antidumping duties by the amount of the section 232 duties is contained in the Proclamation 9705. Had the President intended that antidumping duties be reduced by the amount of section 232 duties imposed, Proclamation 9705 would have expressed that intent.

Preliminary IDM at 12-13 (P.R. 133). This had the effect of decreasing Deacero's net U.S. price and thereby increasing Deacero's calculated antidumping duty margin by the amount of Section 232 duties paid.

## SUMMARY OF ARGUMENT

Commerce's determination in this proceeding suffers from multiple deficiencies arising from its treatment of Section 232 duties applied to steel imports from Mexico. As a threshold matter, the United States' application of Section 232 duties to imports from Mexico was unlawful because duties on Mexico were imposed and implemented outside of the applicable time limits in 19 U.S.C. § 1862(c)(1). Thus, any action taken by Commerce to deduct the duties

from U.S. price is *ultra vires*. Further – even if the imposition of Section 232 duties on the subject imports was lawful – Commerce's determination to deduct the amount of Section 232 duties is unsupported by substantial evidence, arbitrary and capricious, and not in accordance with applicable law. Specifically, Commerce's consideration of relevant factors, including the remedial and temporary nature of Section 232 duties and the fact that deduction of 232 duties would effectively collect such duties twice, is arbitrary and unreasonable in light of the CAFC's decision in *Wheatland* and the unique circumstances surrounding the imposition of Section 232 duties on Mexico. Finally, Commerce's determination to deduct section 232 duties in any proceeding is unlawful because Commerce was required to undertake notice-and-comment proceedings prior to implementing this new rule, and cannot now impose the rule retroactively.

## **ARGUMENT**

## I. **STANDARD OF REVIEW**

Pursuant to 19 U.S.C. § 1516a(b)(1)(B), the standard of review applied by the Court to this action is whether Commerce's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is defined as "more than a mere scintilla," and refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). For the Court to sustain an agency determination, substantial evidence supporting the determination must be based on the whole record, and the Court must take into account not only that which supports the agency's conclusion, but also "whatever in the record fairly detracts from its weight." *Melex USA, Inv. v United States,* 19 CIT 1130, 1132, 899 F. Supp. 632, 635 (1995) (*citing Universal Camera,* 340 U.S. at 478, 488).

To determine whether Commerce's interpretation and application of the statute is in accordance with the law, the Court first determines "whether Congress has directly spoken to the precise question at issue," and gives effect to the intent of Congress if the intent is clear. *Chevron U.S.A., Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837, 842-43 (1984). However, if the statute is silent or ambiguous with respect to the specific issue, the Court then must determine whether Commerce's construction of the statute is permissible by determining whether Commerce's interpretation was reasonable. *See, e.g., NTN Bearing Corp. of America v. United States*, 24 CIT 385, 389-90, 104 F. Supp. 2d 110, 115 (2000).

If an agency's statutory interpretation "is the result of the agency's formal notice-and-comment rulemaking process," then it is entitled to *Chevron* deference. *Wheatland*, 495 F.3d at 1360 (citing *United States v. Mead Corp.,* 533 U.S. 218, 226–27 (2001)). However, "if the Government's position is unreasonable, deference does the agency no good." *Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1083 (Fed. Cir. 2001). Further, well-established principles of administrative law require that Commerce must adhere to its prior policies and practices, or provide a reasonable explanation for any departure. *See, e.g., Sanyo Electric Co., Ltd. v. United States*, 23 CIT 355, 363, 86 F. Supp. 2d 1232, 1241 (1999). Commerce's change of position or practice is reviewed to determine whether the action was arbitrary or capricious. *Id.* Actions which are unsupported by reasoned explanation may be deemed arbitrary and capricious. *See, e.g., Steel Auth. of India, Ltd. v. United States,* 25 CIT 482, 488 n.10, 149 F. Supp. 2d 921, 929 n. 10 (2001).

## II.  COMMERCE'S USE OF UNTIMELY AND THEREFORE UNLAWFUL SECTION 232 DUTIES TO CALCULATE ANTIDUMPING MARGINS WITH RESPECT TO DEACERO IS NOT IN ACCORDANCE WITH LAW

Commerce's treatment of Section 232 duties as "ordinary" customs duties is not in accordance with law because the duties themselves, as applied to imports of Mexican steel

products, are unlawful, making any action taken by Commerce to deduct the duties from U.S. price *ultra vires*. The implementation of Section 232 tariffs on steel imports from Mexico pursuant to Proclamation 9711, and the extension of the implementation of those tariffs pursuant to Proclamation 9740, were invalid because the President's authority to implement tariffs on Mexico expired under 19 U.S.C. § 1862(c)(1)(B) prior to the implementation of the tariffs and the statutory prerequisites for the exception to the time limitation under 19 U.S.C. § 1862(c)(3) were not met.

### A.    The President Failed to Implement Action Under Section 232 Within the Applicable Time Limits

Although Section 232 provides that the President has the discretion to take action—or not take action—based on the Steel Report, 19 U.S.C. § 1862(c)(1) expressly imposes a time limit on any action the President could take to adjust imports of steel products. Specifically, the statute prescribes a 90-day time period, counted from the date of the report, within which the President is to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives . . . ." 19 U.S.C. § 1862(c)(1)(A)(ii). Further, there is a 15-day time period, counted from the date the President makes his decision, within which the President, if determining "to take action to adjust imports of an article and its derivatives," is directed to "implement that action." *Id.* § 1862(c)(1)(B).

As described above, the Secretary, following an investigation initiated under Section 232, submitted a report to the President under 19 U.S.C. § 1862(b)(3)(A) on January 11, 2018. That report was the basis for both Proclamations 9711 and 9740. While Proclamation 9711 was issued on March 22, 2018, within 90 days of the January 11, 2018 Steel Report as contemplated by § 1862(c)(1)(A), the resulting new action the President decided upon in Proclamation 9711—i.e., the imposition of tariffs on imports of steel products from Mexico—was not implemented within the 15-day period required by § 1862(c)(1)(B). Any action implemented pursuant to the decision

made on March 22, 2018 was required to have been made within 15 days of that decision, i.e., April 6, 2018. However, Proclamation 9711 sought to implement tariffs *40 days* after the decision, i.e., May 1, 2018, outside the temporal window permitted under § 1862(c)(1)(B).

Proclamation 9740, seeking to push back the effective date of the tariffs on steel imports from Mexico first contemplated by Proclamation 9711, also fails to meet the relevant timing requirements. Proclamation 9740 was not only issued outside the 90-day period during which the President is permitted to decide to act (based on the January 11, 2018 Steel Report), but it also sought to implement a new action—the delayed implementation of the tariffs on steel imports from Mexico contemplated in Proclamation 9711—outside of both the 15-day period from the date of the decision and the overall 105-day maximum time limit to implement an action permissible under § 1862(c)(1). Any action that the President determined to take based on the January 11, 2018 Steel Report was required to have been made within 90-days, or by April 11, 2018. The President was then required to implement an action based upon the April 11, 2018 decision within 15-days of that decision, or by April 26, 2018.

The procedural safeguards in Section 232 are not merely a roadmap for action; they are constraints on power.[1] The U.S. Supreme Court stressed the importance of the procedural safeguards in holding that Section 232 was not an impermissible delegation of congressional authority over imports. *See Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 559 (1976). The importance of the 90- and 15-day time limits under Section 232 was addressed by this Court in *Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020) ("*Transpacific II*"). In that case, the Court examined whether Proclamation

---

[1] "When Congress means to allow action outside of a set temporal window, it provides for it." *Transpacific Steel LLC v. United States,* 466 F. Supp. 3d 1246, 1253 (Ct. Int'l Trade 2020)*("Transpacific II")* (referring to 19 U.S.C. § 1862(c)(3)).

9772,[2] issued 211 days after the Steel Report and imposing a 50 percent tariff on imports of steel products from Turkey three days later, was permissible under Section 232. *See id.* As the Court observed, "[i]f the President could act beyond the prescribed time limits, the investigative and consultative provisions would become mere formalities detached from Presidential action." *Id.* at 1253 (citing *Transpacific Steel LLC v. United States,* 415 F. Supp. 3d 1267, 1276 (Ct. Int'l Trade 2019) ("*Transpacific I*")). The Court held that the President exceeded his authority in issuing Proclamation 9772 outside of the temporal limits required by Section 232 and that Proclamation 9772 is a violation of the mandatory statutory procedures. *Id*.

### B. No Exception to the Time Limit Applies

As this Court previously recognized*,* there is a single exception to the 90- and 15-day time limitation under § 1862(c)(1):

> In Section 232(c)(3), Congress created an exception to the time limitations in Section 232(c)(1), and an alternate procedure, to apply when the "action" the President chooses to take under Section 232(c)(1) is to pursue a trade agreement "which limits or restricts the importation into, or the exportation to, the United States of the article that threatens to impair national security." 19 U.S.C. § 1862(c)(3)(A)(i). Under this alternate procedure, if, after 180 days, no agreement is reached or if an agreement "is ineffective in eliminating the threat to the national security posed by imports of such article," the President may "take such other actions as the President deems necessary to adjust the imports of such article so that such imports will not threaten to impair the national security."

*PrimeSource Bldg. Prods. v. United States*, No. 20-00032, 2021 Ct. Intl. Trade LEXIS 10, at *41-42 (2021).

The Court's interpretation of the statute provides two possible timeframes for the President to take action based on the report from the Secretary of Commerce, both of which must occur within **90 days** of the receipt of the report: first, the President may take action to adjust the

---

[2] *Proclamation 9772 of August 10, 2018 Adjusting Imports of Steel Into the United States*, 83

imports, and that action must be implemented within 15 days of the President's decision; *or* second, the President may decide to engage in negotiation of an agreement which limits or restricts the importation or exportation. If the President decides to engage in negotiation of an agreement, then he or she can take action outside the 90-day plus 15-day time limitation if *either*: (I) after 180 days no agreement is reached, or (II) an agreement is reached but determined to be ineffective. *See id.* at *113-14 (citing *Transpacific I* at 1276 n.15). With regard to Canada and Mexico, the President appears to have attempted to *both* take action under the first option by imposing tariffs, *and* under the second option by pursuing negotiations. However, by taking "action" to implement tariffs along with the "action" to engage in negotiations, the action to implement tariffs became subject to the 90-day plus 15-day time limitation prescribed by the statute because it was neither a response to a failure to reach an agreement or an agreement not being effective..

On March 8, 2018, in Proclamation 9705, the President stated that he was not imposing tariffs on steel imports from Mexico and Canada but intended to pursue further discussions, arguably triggering the exception contemplated under 19 U.S.C. § 1862(c)(3)(A) and avoiding the 15-day implementation time limit prescribed by 19 U.S.C. § 1862(c)(1)(B). *See* Proclamation 9705 at 11,626. However, fourteen days later on March 22, 2018, the President changed his mind—still within the 90-day time limit prescribed by 19 U.S.C. § 1862(c)(1)(A)—and took action against Mexico and Canada by imposing a new Section 232 "action"—the 25% tariff on steel imports similar to those implemented by Proclamation 9705 from which Canada and Mexico were explicitly excluded—while stating that further discussions were appropriate. *See* Proclamation 9711 para. 11, at 13,362, cl. (1), at 13,363. While Proclamation 9711 itself was still within the 90-day time limit prescribed by 19 U.S.C. § 1862(c)(1)(A), the resulting 25% tariff

Fed. Reg. 40,429 (Aug. 15, 2018) ("Proclamation 9772").

was not implemented within 15 days as required by § 1862(c)(1)(B). Accordingly, the new action of implementing the tariffs was impermissible under all subsections of Section 232: under 19 U.S.C. § 1862(c)(1)(B) because the tariffs were not implemented within 15 days of the Proclamation 9711; under 19 U.S.C. § 1862(c)(1)(A) because the attempted decision to extend the tariff implementation date under Proclamation 9740 was not made within 90 days of the Steel Report; and under 19 U.S.C. § 1862(c)(3) because the President took action outside the 90-day and 15-day time limit.

The question of whether the President's actions imposing tariffs on steel imports from Mexico were permissible past the 90- and 15-day time limit of 19 U.S.C. § 1862(c)(1), and permissible under 19 U.S.C. § 1862(c)(3), turns on whether the President can use the term "discussions" to bypass the time limit and invoke the exception, and then implement a new action or amend the prior action to impose tariffs after the permissible time limit. Such a reading would effectively render meaningless the 90- and 15-day time limit, and ignore the language specifically included by Congress in 19 U.S.C. § 1862(c)(3)(A)(ii). When statutory interpretation yields such irrational results, it suggests that something is wrong with the interpretation. *See, e.g., W. Air Lines, Inc. v. Bd. of Equalization of State of S.D.*, 480 U.S. 123, 133 (1987) (noting that where an interpretation yields illogical results, it "argue[s] strongly again the conclusion that Congress intended these results").

Deacero recognizes that the Court in *Universal Steel Products v. United States* recently rejected the argument that the President was obligated to negotiate for 180 days before choosing alternative action, and that the tariffs imposed on Canada and Mexico were not implemented in violation of the statute. *See Universal Steel Products v. United States*, No. 19-00209, 2021 Ct. Int'l Trade LEXIS 12 (2021). Deacero respectfully disagrees with that decision because Deacero believes the Court in *Universal Steel* did not analyze subsection 1862(c)(3)(A) within the context

of the entire statute,[3] did not examine critical facts, and its conclusion contradicts this Court's own interpretation of time limitations set forth in the statute and explained in *Transpacific II*.

Where a statute creates an exception to a general rule (as § 1862(c)(3) does in creating an exception to the time limitations of § 1862(c)(1)), such exception is to be read narrowly and not interpreted to apply where Congress did not expressly provide for it. *Comm'r v. Clark*, 489 U.S. 726, 739 (1989) ("In construing provisions … in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision.") (*citing A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, (1945) ("To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people.")). However, the Court's reading of the exception in *Universal Steel* suggests that as long as the President's initial "action" makes reference to negotiations or discussions, he or she can bypass the statutory time limits of § 1862(c)(1) without actually negotiating a trade agreement pursuant to § 1862(c)(3)(A)(ii)(I), or reaching such an agreement and making a finding that it is ineffective at eliminating the threat to national security pursuant to § 1862(c)(3)(A)(ii)(II). *See Universal Steel*, 2021 Ct. Int'l Trade LEXIS 12, at *36-37. Yet the tariffs on Mexican imports were not implemented as an "other action" pursuant to § 1862(c)(3)(A) after either no agreement was reached or an agreement reached was found to be ineffective—the tariffs were implemented simultaneously through Proclamation 9711 and therefore must meet the time limits set forth in § 1862(c)(1) and rationale established in *Transpacific II*, in which this Court found that Proclamation 9772 (which was published on August 10, 2018 and increased the 25% tariff on

---

[3] "Words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, (2000) (*quoting Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809 (1989)).

Turkish imports to 50%) was unlawful and void because the tariff increase was not made within the 105-day window required by § 1862(c)(1).

A reading of the exception in § 1862(c)(3) that would allow the President to act outside the time limits set forth in § 1862(c)(1) without either § 1862(c)(3)(A)(ii)(I) or (II) being met as a prerequisite, would be an interpretation of the statute that would render the language superfluous. *See Transpacific II* at 1260; *see also Williams v. Taylor,* 529 U.S. 362, 404 (2000) ("It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute.") (internal quotation marks and citation omitted). The holdings in *Universal Steel* and *Transpacific* appear to be at odds with each other, and Deacero submits that the only reasonable reading of the statute is the one set forth in *Transpacific*. It would be logically inconsistent to say that the implementation of a tariff with respect to imports from Turkey in Proclamation 9705—along with the simultaneous invitation for discussions with Turkey—does *not* invoke the exception of § 1862(c)(3) to bypass the 90- and 15-day time limitations to implement an action (as the Court determined in *Transpacific II*),[4] but the new action under Proclamation 9711 of implementing a tariff with respect to imports from Mexico—along with the simultaneous reference to discussions with Mexico—invoke § 1862(c)(3) and bypass the 90- and 15-day time limitations (as the Court seems to imply in *Universal Steel*).[5]

_____

[4] In *Transpacific II,* the Court held the increase in tariffs from 25% to 50% on steel imports from Turkey was outside the statutorily mandated 90- and 15-day time limit although Presidential Proclamation 9705 (through which the President declared he agreed with the Secretary's findings) invited Turkey to discussions ("any country with which we have a security relationship is welcome to discuss with the United States alternative ways to address the threatened impairment to the national security caused by imports from that country"). *See* Proclamation 9705 para. 9; *Transpacific II,* 466 F. Supp. 3d 1246.

[5] *Universal Steel Products v. United States*, No. 19-00209, 2021 Ct. Int'l Trade LEXIS 12, at *36-37 (2021).

While the chosen Section 232 "action" taken with respect to Mexico and Canada in Proclamation 9705 was "to continue ongoing discussions" instead of implementing tariffs, through Proclamation 9711 (which explicitly stipulates any inconsistent actions of previous proclamations are superseded) the action the President chose was not limited to negotiations. Proclamation 9711 implemented tariffs on Mexico and Canada—tariffs which were not implemented on Mexico and Canada through Proclamation 9705. Deacero respectfully believes the Court in *Universal Steel* did not take into consideration the importance of the sequence of events. The Court appears to have disregarded the fact that Proclamation 9711 implemented the new tariffs on Mexico and Canada when it observed:

> Proclamation 9711, which announced that the United States would attempt negotiations with a number of other nations, including the EU, and thus that those countries would be temporarily exempted from the steel tariff along with Canada and Mexico . . . . This action was taken within fifteen days of the President concurring with the Secretary's finding, and thus complied with the statutory requirements of 19 U.S.C. § 1862(c)(1)(B) . . . . Given that the action that the President chose with respect to those countries was to attempt negotiations, the statute grants him the authority to modify that action if negotiations fail to be successful within 180 days.

*Universal Steel*, 2021 Ct. Int'l Trade LEXIS 12, at *36 (citation omitted).

While the action taken in Proclamation 9705 was to negotiate with Mexico and Canada, Proclamation 9711 "amended" Proclamation 9705 by announcing **two** actions: the continued negotiations *and* the imposition of tariffs on Mexico and Canada for the first time. *See* Proclamation 9711 para. 4, at 13,361, para. 11, at 12,362, cl. 1, at 13,363. Any action other than the negotiation of a trade agreement must adhere to the 90- and 15-day time limitations set forth by the statute. To read the time limitation requirements of the statute any other way would effectively nullify the 90- and 15-day limitation. The Court in *Transpacific II* found that the time limitation was mandatory, not directory. *See Transpacific II* at 1252. If, as the Court's reading of

the statute in *Universal Steel* appears to suggest, all the President has to do is reference "discussions" to bypass the 90- and 15-day limitation, then he also did that in Proclamation 9705 with respect to Turkey and would have been entitled to revise his initial chosen action (25% tariff), and implement the revised action (i.e., increase from 25% to 50%), outside the 90- and 15-day time frame pursuant to Proclamation 9772. The Court however held that he could not. The facts are similar with respect to the tariffs implemented on imports from Mexico. In Proclamation 9705 the President selected ongoing discussions as the appropriate action with respect to Mexico, a decision that was well within the 90-day time limitation. Then he changed his mind—still within the permitted 90-day time frame—and implemented tariffs with respect to imports from Mexico effective May 1, 2018 which was outside the 15-day implementation deadline imposed by the statute.[6]

Importantly, the tariffs contemplated in Proclamation 9711 do not constitute "other actions" in response to a finding that *either* (I) a trade agreement could not be reached or that (II) the trade agreement was unsuccessful under the exception of § 1862(c)(3). The Court in *Universal Steel* appears to read out of the statute that "other actions" taken by the President outside the 90- and 15-day time limits and under the exception of §1862(c)(3) are conditioned upon either of the two events taking place. Such a reading is contrary to the canon of statutory construction that courts are to avoid rendering language in the statute superfluous. *Williams v. Taylor,* 529 U.S. at 404 ("It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute.") (internal quotation marks and citation omitted).

---

[6] Proclamation 9740, which pushed back the effective date of the tariffs on steel imports from Mexico first contemplated by Proclamation 9711, was issued outside the 90-day period and the 15-day period to implement an action. *See* Proclamation 9740.

The proclamation made clear that the tariffs would be imposed as an "important first step" while negotiations continued. Proclamation 9711 para. 11, at 13,362. Yet any action regarding tariffs which the President decides to take within the 90-day window [7] under § 1862(c)(1) but which is implemented more than 15-days after such decision is made (and which is not a response to either no agreement being reached after 180 days or such agreement being ineffective pursuant to 1862(c)(3)) is unlawful and void. To find otherwise would mean that the President could make a *decision* to both implement tariffs and discussions within 90 days, but then *implement* the tariffs more than 15 days after his decision. Such an interpretation reads out of the statute the temporal requirements under § 1862(c)(1) and runs contrary to Congress' intent in making the 1988 amendments. Prior to the 1988 amendments, the relevant provision read "and the President shall take such action, and for such time, as he deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(b) (1982). The current relevant provisions omit the clause "and for such time." 19 U.S.C. § 1862(c)(3)(A) (2018). As this Court explained in *Transpacific II*, "given the changes in the statute, the court holds that regardless of whether modifications were permissible before, 'modifications' of existing Proclamations under the current statutory scheme, without following the procedures in the statute, are not permitted." *Transpacific II* at 1253. Therefore, even if Proclamation 9740 (published outside the 90- and 15-day timeframe) had not extended the effective date of the 25% tariffs on Mexico from May 1, 2018 until June 1, 2018, the tariffs which were first implemented pursuant to Proclamation 9711, outside the 15-days permitted to implement an action under 19 U.S.C. § 1862(c)(1)(B), were untimely and thus unlawful and void.

---

[7] Based on the 90-day window the time for the President to make such a decision expires April 11, 2018, 90 days after having received the January 11, 2018 Steel Report from the Secretary of Commerce.

**C.      Because Section 232 Duties on Mexican Imports Were Unlawful, the Deduction of Such Duties Was Ultra Vires**

Because the duties themselves as applied to imports of Mexican steel products are unlawful, there is no reading of 19 U.S.C. § 1677a(c)(2)(A) under which Commerce could treat such duties as "ordinary" duties and deduct them from U.S. price in calculating antidumping margins. *See Fieldston Clothes, Inc. v. United States*, 19 CIT 1181, 1185, 903 F. Supp. 72, 76 (1995) (the administering agencies' regulatory action taken . . . is *ultra vires* and void if it is beyond the scope of the delegated authority); *see also National Association of Manufacturers v. United States Department of Homeland Security*, 491 F. Supp. 3d 549, 569 (N.D. Ca. 2020) ("Because the Court finds that the issuance of the Proclamation here was contrary to law, its enforcement and implementation by Defendants is similarly unlawful").

## III.      SECTION 232 DUTIES ARE NOT ORDINARY CUSTOMS DUTIES

Even if it was permissible for the United States to impose Section 232 duties on imports of steel products from Mexico between June 2018 and May 2019, it was improper for Commerce to deduct Section 232 duties from U.S. price in its antidumping duty margin calculations because they are not "ordinary" customs duties. Under Section 772(c)(2)(A) of the Act, Commerce must adjust U.S. price for "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties." 19 U.S.C. § 1677a(c)(2)(A).

Commerce has consistently interpreted the phrase "United States import duties" to exclude certain categories of special duties, including antidumping and countervailing duties, and this approach has been upheld by courts. *See, e.g., AK Steel Corp. v. United States*, 21 CIT 1265, 1280, 988 F. Supp. 594, 607-08 (1997), *aff'd*, 215 F.3d 1342 (Fed. Cir. 1999); *Hoogovens Staal BV v. United States*, 22 CIT 139, 146, 4 F. Supp. 2d 1213, 1220 (1998). Commerce's interpretation of the phrase "United States import duties" with respect to Section 201 duties was reviewed by the CAFC in *Wheatland*, 495 F.3d at 1363.  In *Wheatland,* the CAFC applied the

framework established in *Chevron* and found that the phrase "United States import duties" was ambiguous. *See Wheatland*, 495 F.3d at 1360. It then examined Commerce's process for establishing its interpretation, which involved formal notice-and-comment rulemaking and consideration of comments prior to issuing its final rule in April 2004 that § 201 safeguard duties are not "United States import duties" for purposes of 19 U.S.C. § 1677a(c)(2)(A). *Id.* Because Commerce established its interpretation through formal rulemaking, the CAFC found Commerce was entitled to *Chevron* deference regarding its views on Section 201 duties.[8] *Id.*

The *Wheatland* court then upheld Commerce's interpretation of the term "United States import duties," including its view that only "ordinary" customs duties (as opposed to "special" duties) should be included in that term, and its decision to exclude Section 201 duties. *See id.* at 1366. Specifically, it found Commerce's analysis of the following factors to be reasonable: 1) "[l]ike antidumping duties . . . § 201 safeguard duties are remedial duties that provide relief from the adverse effects of imports"; 2) "antidumping duties and § 201 safeguard duties, unlike normal customs duties, are imposed based on almost identical findings that domestic industry is being injured or threatened with injury due to the imported merchandise"; and 3) "§ 201 safeguard duties are like antidumping duties and unlike normal customs duties because they provide only temporary relief from the injurious effects of imports." *Id.* at 1362 (citation omitted). The CAFC also noted that "given the fact that § 201 safeguard duties were not enacted until 1974 and therefore could not have been considered either 'United States import duties'

---

[8] Notably, the CAFC was "obliged to accept [Commerce's] position" on the issue of § 1677a(c)(2)(A) and § 201 safeguard duties as set forth in the final results of its formal notice-and-comment proceeding if Commerce's "interpretation is reasonable." *Wheatland*, 495 F.3d at 1360 (citing *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)). As discussed below, Deacero submits that Commerce's failure to initiate a formal notice-and-comment rulemaking establishing its interpretation of "United States import duties" with respect to Section 232 duties renders subsequent administrative determinations based on this ruling void. Commerce's failure to undergo notice-and-comment procedures in this case also means it is entitled to less deference in this case than it received in *Wheatland*.

under § 1677a(c)(2)(A) as originally enacted in 1921 or 'special dumping duties,' it was reasonable for Commerce to conclude that § 201 safeguard duties are more like antidumping duties 'in purpose and function than they are like ordinary customs duties.'" *Id.* (quoting Commerce's determination in *SWR from Korea*). Finally, the CAFC noted that "Commerce's conclusion that including § 201 safeguard duties as 'United States import duties' would improperly lead it to collect a double remedy is also reasonable." *Id.* at 1363.

In the proceeding at issue, Commerce relied on the CAFC's decision in *Wheatland* to support its view that Section 232 duties are "ordinary" customs duties that should be deducted from U.S. price. *See* Final IDM at 12 (P.R. 192). Commerce is correct that the CAFC in *Wheatland* upheld Commerce's decision not to deduct Section 201 duties because it found Commerce's consideration of certain factors – the remedial nature and purpose of the duties, their temporary nature, the fact that they were established *after* the relevant statutory provision regarding deduction, and Commerce's desire to avoid collecting a double remedy – to be reasonable. *See Wheatland*, 495 F.3d at 1366. In making a determination whether to deduct Section 232 duties, Commerce applied some of the same factors reviewed by the CAFC in *Wheatland* and concluded that, unlike Section 201 duties, Section 232 duties are not imposed to remedy an injury, are not temporary, and may be used to increase antidumping duties without incorrectly imposing a double remedy. *See* Final IDM at 12-13 (P.R. 192).

Deacero is aware of this Court's determination in *Borusan*, which reviewed Commerce's application of three *Wheatland* factors to Commerce's determination to deduct Section 232 duties when calculating the dumping margin for the Turkish producer Borusan in the 2017-2018 administrative review on circular welded carbon steel standard pipe and tube ("CWP") products from Turkey. *See Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. United States*, 494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021). Deacero respectfully submits that, in this case, factors

specific to the imposition of Section 232 duties on Mexico – including the clear link to antidumping and countervailing duties and revocation of Section 232 duties by Proclamation 9894 and the Joint Agreement – distinguish this case from *Borusan* and demonstrate that Commerce's decision is unreasonable.

A.     **Section 232 Duties are Remedial**

As an initial matter, the mere fact that Section 232 duties are different than Section 201 and antidumping duties does not automatically make Section 232 duties "ordinary." The remedial nature of a particular kind of import duty does not necessarily turn on the type of harm the duty is trying to remedy – only that it is imposed to remedy some type of harm to the domestic industry. As the CAFC pointed out in *Wheatland*, even "antidumping duties and countervailing duties are different in as much as they remedy 'distinct harms' and redress 'dissimilar trade distortions,' yet neither one is considered 'United States import duties' under § 1677a(c)(2)(A) and neither one is deducted from the [export price ("EP")] in calculating dumping margin." *Wheatland*, 495 F.3d at 1363. Accordingly, Commerce's focus on Section 232's national security purpose is misplaced.

Contrary to Commerce's view, Section 232 duties exist along the same spectrum of remedial duties as antidumping, countervailing, and Section 201 duties. As described in Proclamation 9705, the United States imposed Section 232 duties after "taking into account the close relation of the economic welfare of the Nation to our national security." Proclamation 9705 para. 2, at 11,625. Further, Section 232 duties, like antidumping and Section 201 duties, are clearly based on a finding that the "domestic industry is being injured or threatened with injury due to the imported merchandise." The Proclamation also states that Section 232 duties will decrease large quantities of steel products from entering the U.S. market and will prevent the "decline" of the domestic steel industry and "weakening" of U.S. economy. Proclamation 9705

para. 2, at 11,625. Proclamation 9705 unambiguously provides that "the tariff imposed by this proclamation is an important first step in ensuring the economic viability of our domestic steel industry." *Id.* para. 11, at 11.626. These statements establish that Section 232 duties are intended to remedy the harms caused by imports of steel products on the domestic steel industry and protect its viability. Thus, Section 232 duties are clearly "remedial" and are intended to address a specific threat to the domestic industry.

With respect to Mexico in particular, the Proclamations establishing and removing Section 232 duties make it clear that the Section 232 duties were imposed to remedy harms associated with dumped and subsidized products. In announcing the removal of Section 232 duties on Mexico and Canada, Proclamation 9894 states that the "satisfactory alternative means to address the threatened impairment of the national security" included "a range of measures with Canada and Mexico to prevent the importation of steel articles that are *unfairly subsidized or sold at dumped prices*, to prevent the transshipment of steel articles, and to monitor for and avoid import surges." Proclamation 9894 para. 5, at 23,987 (emphasis added). Proclamation 9894 goes on to explain that these measures are expected to maintain imports at historical levels, which will allow the domestic industry to operate at a sufficient capacity utilization, which will in turn address national security concerns. *See id.* Commerce's position in these proceedings that Section 232 duties "are not focused on remedying injury to a domestic industry," and, instead "focused on addressing national security prerogatives, separate and apart from any function performed by antidumping and 201 safeguard duties to remedy injury to a domestic industry," directly contradicts the Presidential statements establishing Section 232 duties. *See* Final IDM at 12 (P.R. 192); *see also* Preliminary IDM at 13 (P.R. 133).

Additionally, despite Commerce's current position, Commerce's own findings in the underlying Section 232 investigation reveal that Section 232 duties were imposed to remedy

25

specific harms to the domestic industry. The record from the Section 232 investigation is full of references to the need to "remedy" the harms being caused to the domestic industry. *See generally* Steel Report at 40,203. For example, in the Steel Report, the Secretary of Commerce determined that excessive imports of steel have adversely impacted the economic welfare of the U.S. steel industry, and low-priced imports have impacted the U.S. steel industry financially, resulting in the closure of steel mills, decline in employment, and loss of domestic sales and market share, among other harms. The conclusions of the report state that "[s]teel producers in the United States are facing widespread harm from mounting imports" and that "[i]t is evident that the U.S. steel industry is being substantially impacted by the current levels of imported steel" and therefore "the Secretary recommends that the President take corrective action." *Id.* at 40,225.

Moreover, the testimony of U.S. steel industry representatives demonstrates industry support for Commerce to take *remedial* action to avoid harm to U.S. producers. For example, testimony from Timken Steel Corporation noted:

> There is no "one size fits all" remedy to this issue. With hundreds of steel products across multiple countries, the remedy must be flexible enough to address the complex nature of the global steel trade. We recommend accessing all of the tools in the remedy toolbox, including tariffs, quotas, VRAs and more and in some instances, a combination of remedies may be necessary.

*Id.* app. F, at 39 (testimony of Ward Timken, Timken Steel Corporation). Similarly, testimony from Stupp Corporation noted that "[a] failure to grant broad relief to the steel industry will result in further harm to U.S. producers and workers." *Id.* app. F, at 65 (testimony of John Stupp, Stupp Corporation). These statements show that both Commerce and the parties participating in the Section 232 investigation understood that Section 232 duties are special measures taken to remedy identifiable harm to the U.S. steel industry. Commerce's own report on its Section 232 investigation makes clear that in imposing 232 duties, Commerce and the President found the

domestic industry to be injured by certain imports and took corrective action by imposing duties on those imports – just like the Administration does with antidumping, countervailing, and Section 201 duties.

In *Borusan*, this Court recognized that "Section 232 duties are remedial, not in the sense of AD/CV duties but more closely to the sense of remediation reflected in Section 201," but ultimately noted that Commerce's view was not "completely bereft of logic." *Borusan*, 494 F. Supp. 3d at 1374. Deacero respectfully submits that in this case, the language of Proclamation 9894 makes Commerce's already weak position untenable. Proclamation 9894 directly establishes a link between Section 232 duties and dumped and subsidized goods, and indicates Section 232 duties were viewed as a tool to remedy concerns over dumped and subsidized products from Mexico. This language makes it clear that, at least with respect to imports of steel from Mexico, Section 232 duties serve a remedial purpose that exists along the same spectrum as section 201, antidumping, and countervailing duties.

**B.      Section 232 Duties are Temporary**

Under *Wheatland*, the temporary nature of Section 201 duties was another factor in determining whether the duties at issue are "normal customs duties." *Wheatland*, 495 F.3d at 1362. The CAFC noted that Section 201 duties were temporary, while normal customs duties "have no termination provision and are permanent unless modified by Congress." *Id.* However, Section 232 duties are equally temporary as Section 201 duties, when compared with ordinary customs duties.

Unlike normal customs duties, Section 232 duties have been invoked, adjusted and terminated by unilateral action of the President. With respect to Mexico in particular, the President suspended, then applied, and then terminated Section 232 duties for Mexican steel imports by unilateral action. As discussed above, this type of unpredictable, rapidly-changing

application of Section 232 duties amounted to an *ultra vires* action because it failed to comply with the relevant deadlines for action established by Section 232 and the Steel Report. However, even if this Court were to find that the implementation of Section 232 duties in this manner was valid, the process stands in stark contrast to the process by which "ordinary customs duties" within the meaning of 19 U.S.C. § 1677a(c)(2)(A) are established. Ordinary customs duties are not adjusted or terminated by Presidential whim, but are bound by U.S. WTO commitments. *See* Uruguay Round Agreements Act, 19 U.S.C. § 3511. As this Court has recognized, "lack of permanence is not a viable reason to distinguish Section 201 duties from Section 232 duties." *Borusan,* 494 F. Supp. 3d at 1375.

C. **Deduction of Section 232 Duties from the U.S. Price of Mexican Steel Imports Results in an Impermissible Double Remedy**

Finally, the deduction of Section 232 duties imposes the type of double remedy that both Commerce and the CAFC have recognized is impermissible. *See Wheatland*, 495 F.3d at 1363 (recognizing the importance of Commerce's need to avoid deducting Section 201 duties when doing so "effectively would collect the 201 duties twice-first as 201 duties, and a second time as an increase in that dumping margin," and that "[n]othing in the legislative history of section 201 or the AD law indicates that Congress intended such results.") (citation omitted). Despite Commerce's historical recognition of this issue, its Final IDM addresses it only in passing, stating:

> We disagree that deducting section 232 duties from the U.S. price risks imposing a double remedy. We find that reducing U.S. EP and CEP by the amount of reported section 232 duties in the context of this administrative review is consistent with section 772(c)(2)(A) of the Act, because it instructs Commerce to adjust EP and CEP for "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties.

Final IDM at 13 (P.R. 192) (citing 19 U.S.C. § 1677a(c)(2)(A)). This conclusion, void of any

statutory context or analysis, is tautological and fails to meet Commerce's obligation to articulate a reasoned basis for its decision. The fact that section 772(c)(2)(A) of the Act instructs Commerce to adjust EP and CEP for the amount of any "United States import duties" applies equally to section 201 duties and does not, by itself, address the double remedy issue. *See* 19 U.S.C. § 1677a(c)(2)(A).

Deacero recognizes that when examining the double remedy issue in *Borusan*, this Court concluded that there is a lack of clear statutory interplay between the antidumping statute and Section 232, which differentiates Section 232 from Section 201 and permits deduction of Section 232 duties from U.S. price. In this case, however, Commerce did not use that reasoning or discuss issues of statutory interplay when explaining its decision. In cases like this, when the Court is reviewing a closed agency record, the agency's "decision must be justified within the four corners of that record" *In re Gartside*, 203 F.3d 1305, 1314 (Fed. Cir. 2000), and courts may not "supply a reasoned justification for an agency decision that the agency itself has not given." *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015) (internal quotations and citations omitted). This fact alone would warrant vacating Commerce's determination in this case.

Moreover, with respect to imports from Mexico in particular, Proclamation 9894 and the Joint Agreement between the United States and Mexico warrant special consideration of the double remedy prohibition. First, to the extent this Court wishes to consider the interplay between antidumping duties and Section 232, with respect to Mexico, this interplay is clearer. Proclamation 9894 states that the "satisfactory alternative means to address the threatened impairment of the national security" included "a range of measures with Canada and Mexico to prevent the importation of steel articles that are *unfairly subsidized or sold at dumped prices*, to

prevent the transshipment of steel articles, and to monitor for and avoid import surges."[9] Proclamation 9894 para. 5, at 23,987. Moreover, the Joint Statement and Proclamation 9894 made it clear that any national security issues associated with imports of steel products of Mexico are resolved, and there is no further need or basis to levy Section 232 duties on such imports. Mexico made the commitments outlined in the Joint Statement under the assumption that Mexican producers would no longer face 232 duties, in any form.

Commerce's determination, however, means that Deacero has continued to be impacted by Section 232 duties despite the United States' promises to cease collection of such duties on imports from Mexico. Effectively, Commerce has continued to impose Section 232 duties on imports from Mexico, in the form of increased duty assessment on imports made during the period of review and in the form of increased duty deposit rates for all prospective imports made by Deacero. Additionally, since Section 232 duties have already been collected with respect to imports of rebar during the period of review, deducting such duties from U.S. price would mean that the same duties will be collected a second time in the form of increased duty assessments on imports during the period of review. By continuing to impose Section 232 duties on imports made by Deacero after the date of the Joint Agreement, Commerce is acting in a manner contrary to the United States' bilateral commitments to Mexico.

Commerce has an obligation to act consistently with Presidential Proclamations and international commitments. Commerce's interpretation of Section 232 duties as "ordinary" duties

---

[9] Moreover, there is nothing about the text of Section 201 itself that prohibits the inclusion of section 201 duties in "United States import duties." Instead, the interplay between section 201 and antidumping duties becomes evident by examining the purpose and circumstances surrounding section 201 duties, including the fact that the U.S. International Trade Commission and President must consider antidumping and countervailing duties when imposing section 201 duties. While subsidized and dumped products or antidumping duties are not explicitly mentioned in the legislative history of Section 232 duties, they are, as matter of practice, considered in Commerce's injury investigation, Presidential Proclamations imposing and removing 232 duties, and in bilateral trade negotiations involving Section 232 duties.

conflicts with the Joint Agreement in contravention of the principles established in *Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804). As the Federal Circuit has explained, "[t]he understood rule of *Charming Betsy* is that 'an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains.'" *In re City of Houston*, 731 F.3d 1326, 1333–34 (Fed. Cir. 2013) (citing *Charming Betsy*, 6. U.S. at 118).

Commerce itself recognized that the Joint Agreement proscribed limitations on its authority to continue to collect Section 232 in the form of increased dumping duties. Specifically, in the Preliminary IDM, Commerce stated that "because the proclamation took effect after the end of the POR of the instant review and contains no retroactive clause, it is appropriate to continue to deduct the 232 duties paid on Deacero's entries of subject merchandise during the POR from the U.S. price." Preliminary IDM at 14 (P.R. 133). Commerce's reasoning is incorrect because, the decision to collect additional duties resulting from the deduction of Section 232 duties and the actual collection of duties will take place *after* the Joint Agreement and Proclamation 9894. The Joint Agreement and Proclamation 9894 do not have a retroactive clause allowing Section 232 duties to be collected again retroactively with respect to entries made prior to the Joint Agreement and Proclamation 9894. Those duties have already been collected once. Accordingly, Commerce may not now increase Deacero's antidumping duty margin by the amount of Section 232 duties, as that would result in an impermissible double remedy on Mexican imports.

IV.    **COMMERCE'S DECISION TO DEDUCT SECTION 232 DUTIES FROM U.S. PRICE WITHOUT NOTICE VIOLATES LONGSTANDING PRINCIPLES OF ADMINISTRATIVE LAW**

Even if Commerce's interpretation of the term "import duties" is valid, and its application of the factors in *Wheatland* would otherwise be reasonable, Commerce's determination suffers from fatal procedural flaws. Under the Administrative Procedure Act ("APA"), a "rule" is "the

whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). Although these proceedings relate specifically to the application of Commerce's Section 232 rule on Deacero, Commerce has, as a matter of practice, followed the same policy in a number of decisions with the same line of reasoning and nearly identical language.[10] Thus, functionally, Commerce's policy on the deduction of Section 232 duties has the effect of an administrative rule. Moreover, this new rule regarding Section 232 duties runs contrary to the rule approved in *Wheatland*, of not deducting other special duties like Section 201 duties. However, Commerce did not follow any of the proper procedures in implementing its rule. In doing so, it violated the notice and comment requirements of the APA, as well as the established presumption against retroactivity in administrative rules.

### A. Commerce Failed to Submit its Rule Regarding Deduction of Section 232 Duties for Notice and Comment

Prior to deciding how to account for the new Section 232 duties in antidumping and countervailing duty proceedings, Commerce was required to notify the public of its plans and allow public comment. Specifically, the APA requires federal government agencies to provide notice of rules at least 30 days in advance of publication, and to allow interested parties to submit comments. *See* 5 U.S.C. § 553(b)-(d). While the APA exempts "interpretative rules, general

---

[10] *See, e.g.*, *Circular Welded Carbon Steel Standard Pipe and Tube Products From Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 3616 (Dep't of Commerce Jan. 22, 2020) and accompanying Dec. Mem. at comment 3; *Light-Walled Rectangular Pipe and Tube From Mexico: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 21829 (Dep't of Commerce Apr. 20, 2020) and accompanying Dec. Mem. at comment 2; *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 41962 (Dep't of Commerce Jul. 13, 2020) and accompanying Dec. Mem. at comment 3.

statements of policy, or rules of agency organization, procedure, or practice" from its notice-and-comment requirements, it is clear that Commerce's policy on treatment of Section 232 duties in antidumping duty reviews is a "substantive" rule that must undergo notice and comment procedures to be in accordance with the law. 5 U.S.C. § 553(b)(3)(A).

As the CAFC has explained:

> In general terms, case law has defined "substantive rules" as those that effect a change in existing law or policy or which affect individual rights and obligations. "Interpretative rules," on the other hand, clarify or explain existing law or regulations and are exempt from notice and comment under section 553(b)(A).

*Paralyzed Veterans of Am. v. West*, 138 F.3d 1434, 1436 (Fed. Cir. 1998) (internal citations omitted). Further, "[a]n agency's failure to comply with notice-and-comment procedures, when required, is grounds for invalidating a rule." *Preminger v. Sec'y of Veterans Affs.*, 632 F.3d 1345, 1350 (Fed. Cir. 2011).

Commerce's behavior with respect to Section 201 duties confirms that Commerce is obligated to conduct rulemaking procedures when deciding, for the first time, whether a particular type of tariff is an "import duty" under the governing statute. *See Notice of Antidumping Proceedings: Treatment of Section 201 Duties and Countervailing Duties,* 68 Fed. Reg. 53,104 (Dep't of Commerce Sep. 2003) (Commerce requesting "comments on the appropriateness of deducting section 201 duties and countervailing duties from gross unit price in order to determine the applicable export price or constructed export price used in antidumping duty calculations."). Notably, this fact played a key role in the CAFC's decision to grant *Chevron* deference to Commerce's interpretation of "United States import duties" with respect to Section 201 duties. *Wheatland*, 495 F.3d at 1360 ("Because Commerce's interpretation that 'United States import duties' do not include § 201 safeguard duties was the result of its formal notice-and-comment rulemaking process, Commerce's interpretation is entitled to deference as

required by step two of Chevron if its interpretation is reasonable."). It follows that Commerce's statutory interpretation with respect to Section 232 duties should have undergone formal notice-and-comment rulemaking.[11]

While Commerce was not obligated to treat Section 232 duties in the same substantive manner as Section 201 duties, it was required to treat the determination of whether or not to deduct the duties in the same procedural manner. Thus, when presented with the issue of whether to deduct Section 232 duties from U.S. price, Commerce should have postponed any administrative review decisions until it had time to seek public notice and comment on the issue.

### B. Commerce's Determination to Deduct Section 232 Duties is Impermissibly Retroactive and Upset Deacero's Reliance Interests

In addition, Commerce's decision to deduct Section 232 duties from U.S. price, particularly when viewed in light its departure from the rule established in *Wheatland* and the Joint Agreement, impermissibly and retroactively infringes on Deacero's settled expectations and reliance interests. As a regular and diligent participant in administrative review proceedings, Deacero relies on normal Commerce's practices to establish U.S. prices at fair value and avoid dumping margins.

"Retroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). As this Court has explained, "[t]his presumption against retroactivity is deeply rooted in our jurisprudence," and "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal." *ALZ N.V. v. United States*, 27 CIT 1265, 1272,

---

[11] Even if this Court were to find that Commerce's determination was not a substantive rule subject to formal notice-and-comment rulemaking requirements, Commerce would not be entitled *Chevron* deference regarding its interpretation.

283 F. Supp. 2d 1302, 1309 (2003), *dismissed*, 114 F. App'x 401 (Fed. Cir. 2004). Under governing case law, "an impermissibly retroactive law is one that 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.'" *Kearfott Guidance & Navigation Corp. v. Rumsfeld*, 320 F.3d 1369, 1374 (Fed. Cir. 2003) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994)). This principle applies equally to administrative regulations as it does to statutes. *ALZ N.V.*, 27 CIT at 1273 ("The general rule disfavoring retroactivity applies as well to administrative regulations.")

Commerce's actions with respect to Section 232 duties have essentially created a new regulatory rule under which Section 232 duties must be deducted from the U.S. price in antidumping duty proceedings. Commerce's decision to change its interpretation of "United States import duties" and related methodology for calculating the dumping margin after the fact, and with no warning, created new financial and legal rules in respect to transactions already past. This Court has previously overturned Commerce determinations under similar circumstances. For example, in *ALZ N.V.*, the Court found that the application of a new regulation emphasizing pre-infusion objective analysis could not be applied to countervailing duty calculations for imports that occurred prior to the effective date of the regulations, as such application "effectively imposes new duties on a party . . . with respect to transactions already completed." *ALZ N.V.*, 27 CIT at 1275. "This type of retroactive application deprives parties of the opportunity to know what the rules are and to conform their conduct accordingly." *Id.* Likewise, in this case Commerce's new rule including Section 232 duties in the scope of "United States import duties" has unfairly and artificially increased Deacero's dumping margin, and will impose a financial liability that Deacero could not have foreseen or prevented.

The harm to Deacero was further exacerbated by the fact that Section 232 duties were imposed on Mexican imports with little warning, which meant that exporters had no time to make commercial adjustments to account such duties. Moreover, the extraordinary nature of Section 232 duties and the CAFC's holding in *Wheatland* meant that most members of the trading public would have assumed that such duties were special duties that would not be deducted from U.S. price in margin calculations. While agencies are "free to change their existing policies as long as they provide a reasoned explanation for the change," an agency "must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (internal citations and quotations omitted). Notably, "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id.* at 2126 (internal citations and quotations omitted). In sum, Commerce's determination to depart from its practice in *Wheatland* without any notice or opportunity for comment, and to apply its new interpretation to transactions that had already taken place, was arbitrary and capricious and should be vacated.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should find Commerce's Final Results to be unsupported by substantial evidence and otherwise not in accordance with law, and remand this action to Commerce for further proceedings.

Dated:  May 10, 2021                    Respectfully submitted,

/s/ Rosa S. Jeong
Rosa S. Jeong
Sonali Dohale
Friederike S. Görgens
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC  20037
(202) 331-3100 (Phone)
(202) 331-3101 (Fax)

*Counsel for Plaintiffs Deacero S.A.P.I. de C.V. and
Deacero USA, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(2), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Brief in Support of Plaintiffs' Motion for Judgment on the Agency Record, as computed by the word count function of the word processing system used to prepare the brief, is 12,009 words (not including table of contents, table of authorities, counsel's signature block and this certificate).

Dated:  May 10, 2021                    Respectfully submitted,


                                        /s/ Rosa S. Jeong
                                        Rosa S. Jeong
                                        GREENBERG TRAURIG, LLP
                                        2101 L Street, N.W., Suite 1000
                                        Washington, DC  20037
                                        (202) 331-3100 (Phone)
                                        (202) 331-3101 (Fax)

                                        *Counsel for Plaintiffs Deacero S.A.P.I. de C.V. and
                                        Deacero USA, Inc.*